# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Wanda Brazile, | : | Case No. 1:09CV1476 |
| Plaintiff | : | Judge Dan A. Polster |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §405(g) seeking judicial review of defendant's final determination denying plaintiff's claim for disability benefits, 42 U.S.C. §§416(i), 423, is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in her favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

Plaintiff applied for benefits on September 28, 2004, alleging an onset date of June 21, 2001. In an accompanying Disability Report - Adult the questions "What are the illnesses, injuries or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?" were answered "Upset stomach, diarrhea, difficulty sleeping; dizzy spells; severe right elbow, arm and hard pain (right elbow surgery scheduled 09/04); severe leg and foot pain, shoulder pain, buttock pain, frequent headaches, heart palpitations, high blood pressure, depression, panic attacks, moody, dysthymia, severe chronic obstructive pulmonary [unreadable],

cervical myofascial pain, arthritis"[1] and "can not stand bend, stoop, lift, sit or walk without severe pain. Headaches, heart palpitations, can not concentrate, in constant pain, fall down due to pain and numbness in legs, have a hard time being around people."

The plaintiff's last date of being fully insured, a requisite of eligibility for an award of DIB, was September 30, 2003. Therefore, to be entitled to an award of the benefits she seeks she must establish that she was disabled no later than that terminal date.

Upon denial of plaintiff's claim on the state agency level hearing de novo before an Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on March 31, 2006. Also testifying at that proceeding was a vocational expert, Mr. Mark Anderson.

On September 7, 2006 the ALJ entered his decision finding the plaintiff not disabled. That ruling, however, was set aside by the Appeals Council in an order entered December 20, 2006. The basis of that ruling was that the ALJ's decision did not contain an adequate evaluation of the plaintiff's pain and/or subjective complaints. The ALJ was directed upon remand to:

> Further evaluate the claimant's complaints of pain and/or subjective complaints in accordance with 20 CFR 404.1529 and Social Security Ruling 96-7p.
>
> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of the assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating and examining source opinions and non-

---

[1] This laundry list of ailments, some of which are reflected in the plaintiff's medical history and others are not, may be explained by the following from a MMPI testing performed for a psychological evaluation performed in May 2004—"these individuals show multiple complaints particularly regarding viceral-abdominal pain, weakness and fatigue. Many of these patients show chronic hypochondriases. There physical problems are exacerbated by repressed emotions. However, they usually lack insight into any such connection. They tend to be overly passive and clinically depressed about their health and other life problems."

2

>examining source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Rulings 96-2p, 96-5p, and 96-6p, and explain the weight given to such opinion evidence.

A second hearing was held on May 7, 2007, at which the plaintiff was represented by new counsel. Testifying at that proceeding in addition to the plaintiff were a medical expert, Dr. Melvin Ross, whose area of specialty is psychiatry, and a vocational expert, Dr. Nancy Borgeson.

At that proceeding the plaintiff ascribed her alleged inability to work to the combination of physical (exertional) and mental/emotional (non-exertional) factors, first testifying that she had been suffering from panic attacks, depression and anxiety long before 2003 or 2004, and that "they just kept getting worse and worse," When later asked by the ALJ "Tell me about your depression" the plaintiff testified:

>A. I'm tired, sad. I don't feel like doing anything.
>
>Q. Sad about what?
>
>A. Life.
>
>Q. In what way are you sad about life?
>
>A. I'm just sad. All the people in my life are gone.

The plaintiff then testified as follows when questioned by her counsel:

>Q. Ms. Brazile, I know that you're sad.
>
>A. Yeah.
>
>Q. Would it be okay if I asked you some more questions?
>
>A. Yeah.
>
>Q. I know as a child you suffered losses of your mom and dad.
>
>A. Yeah.

Q. And your grandma.

A. Yes.

Q. All in a few years.

A. Yes.

Q. Somehow you were able to pull yourself through that a little bit, and you worked. You got married. What happened in the last few years that you'd like to share with us that really started to get you back into your depression?

A. My sister passed away.

Q. Yeah, when was that?

A. '98.

Q. So that was in '98. Is that when you started your depression again?

A. That's when I started having the panic attacks.

Q. Okay, let's talk a little bit about the depression. After your sister passed, did you recover?

A. No.

Q. Then what happened?

A. Then a patient I had for five years passed away.

Q. Yeah, he was like a grandfather, wasn't he?

A. Yes.

Q. Okay.

A. I never knew either one of my grandfathers.

Q. You have to speak up, dear.

A. I never knew either one of my grandfathers, so he was like a

grandfather to me.

Q. Um-hum, okay. Were you able to work after that?

A. No.

Q. Okay, you had some problems at your last job, didn't you?

A. Yeah, it became difficult to lift things and do my job. It was difficult concentrating too.

Q. I know that your husband just recently passed away.

A. Yeah.

Q. Okay. I want to talk about your depression before that, before 2001, 2002, 2003. What was it like for you back then?

A. It was hard. I was constantly tired, in pain, having panic attacks and chest pains.

Q. Were you able to be the person you wanted to be?

A. No.

Q. Did you do social things?

A. No.

Q. Were you able to take care of the house?

A. No, my husband helped me.

Q. Um-hum, you have grown children with your husband, don't you?

A. Yes.

Q. Did they help you at all?

A. Yeah, they would come and stay with me if my husband had to go somewhere.

Q. What was your social life like after you stopped working in 2001, 2002?

> A. I didn't have a social life. I just stayed at home with my husband.

When questioned by the ALJ Dr. Ross addressed the plaintiff's mental/emotional state as follows, starting with reference to a report from Dr. James L. Helmuth, a clinical psychologist who evaluated the plaintiff in May 2004:

> Okay, they diagnosed on Axis I, major depressive disorder, recurrent, moderate, superimposed on dysthymia. And then dysthymia severe. On Axis II, rule out avoidant personality disorder and assigned a GAF of 45. At 5F, page one, on May 21, 2004 Dr. Helmut [sic] made a report. He said the patient was first examined on March 4, 2004, and his last examination was on May 20, 2004. Dr. Helmut [sic] diagnosed a severe dysthymia and major depression. He attributes her depressive affect to an accident of nine years ago and the death of her sister in 1999. On page five—on page two of that Exhibit 5F, he indicated dysthymia for the past five years, which became worse in the year 2000. He said that there have been positive responses to counseling, yet he did not believe she could tolerate the stress of any job. And Dr. Casterwide [phonetic] in 11F, page two, from the state agency March the 7th, 2005, indicates that although the Claimant complains of major depression since June 26 of 2002, there is no indication of any mental health treatment until March of 2004. And there was the issue of the date last insured, and I didn't understand what that meant. I noted in my review of the record that she had used opiates throughout the record that I reviewed except 1989. And now the second part of my testimony really has to do with what was submitted recently, and I have a question in that regard. And that is who is Nancy Burger [phonetic]? Is Nancy Burger working with Dr. Mohan [phonetic]?
>
> CLMT: Yes.
>
> ME: Okay.
>
> CLMT: She's a counselor.
>
> ME: She's a counselor?
>
> Okay, now both Dr. Mohan and Nancy Burger have submitted

assessments of ability to do work, and they have indicated marked limitations in the ability to maintain concentration for at least two straight hours with at least four such sessions in a work day and marked limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances as well as marked limitations in the ability to do simple instructions and respond appropriately to criticisms from supervisors, marked limitations in the ability to respond appropriately to changes in the work setting, to travel in unfamiliar places and to set realistic goals. Additionally, they estimated that the patient would be unable—would be absent from work as a result of the impairment or treatment more than four times per month. There are some notes by Ms. Burger in the record referring to the losses that the patient has sustained in the recent past. And Dr. Mohan's response to this same form is approximately the same as what I just read from Ms. Burger. He diagnosed mood disorder present secondary to chronic pain with spinal cord stenosis, degenerative disc disease, and grief adjusted to the death of her spouse, death of her parents, when she was younger. At that time she was 16. And inability to sleep, poor concentration, not eating and lethargy, and this is Exhibit 29F, page three. Now on the basis of the material submitted by these two people, Ms. Burger and Dr. Mohan, the patient would meet the listings of 12.04 or at least equal the listings of 12.04 with the orthopedic problems.

Q. Doctor, can you tell me when she would start meeting?

A. Well, I would have to say that it would be after May 20, 2004 which is the first record I have, 5F, page four, of Dr. Helmut's [sic] history in the record. He assigned a GAF of 45 at that time. The only thing I would point out is the inconsistency in the record. The patient's signing out AMA in 1989 for alcohol treatment, the fact that she had to be referred by her disability representative, which is strange because generally patients with this severe depression will seek out treatment on their own. However, it would appear—and I didn't ask her about this—how frequently she is consulting Dr. Mohan and Ms. Burger at this time, and when she started that type of consultation. So that might be helpful. Can I ask that?

ALJ:   Yes.

ME: When did you start with Dr. Mohan and Ms. Burger?

CLMT: Started with Dr. Mohan—I don't know—must have been 2004, 2005. I just recently started with Ms. Burger.

ME: At the suggestion of Dr. Mohan?

CLMT: Of Dr. Mohan.

ME: Now when you say just recently, what would you guess to be about that? Is that in 2006 or 2007?

CLMT: 6.

ME: I'm sorry?

CLMT: 2006.

ME: 2006.

ATTY: Excuse me, if I may. You had another psychiatrist. You forgot to tell us about her.

CLMT: Dr. Kimberly Kumar [phonetic].

ME: Well, I didn't see any reports—

ATTY: No, she's moved as far as I know. I don't know where she is.

CLMT: I seen her before Dr. Mohan.

ME: You did?

CLMT: Yeah.

ME: When did you start with her?

CLMT: 2003 or 2004.

ME: Would that be before or after you saw Dr. Helmut [sic]?

CLMT: Before.

> ME: Before?
>
> CLMT: I believe so.

That line of inquiry was followed up upon by the plaintiff's counsel, who elicited the following testimony from Dr. Ross:

> Q. I want to talk a little bit about the records that you got, Doctor, and you said that you felt that she met the listings as of doctor's report May of '04.
>
> A. Yes, that would be in retrospect after I looked at those.
>
> Q. I can appreciate that.
>
> A. Yeah.
>
> Q. What were the reasons she was depressed then that you feel would lead to the meeting the listings?
>
> A. Well the depression associated with the losses and the—in combination with orthopedic problems that have been going on at that time.
>
> Q. What losses, sir?
>
> A. The loss of her sister and her husband.
>
> Q. In your profession, how profound is the loss of someone that's close to you, a loved one and its impact on life?
>
> A. Well, it has varying effects on people, and apparently the examiners, in this case Burger, Mohan, and Helmut [sic], all felt that this had played an important role in her case. It varies from person to person.
>
> Q. Right, in our particular situation though with what you have there it seems like it was a very profound serious impact on her?
>
> A. Yes, that certainly would be the case judging from these most recent exhibits. I was not impressed in the report from Dr. Helmut [sic]. I have to say that that standing alone did not influence me to feel that she equaled the listings. That's why I

9

    divided my testimony.

Q. Sounds like you put a lot of things together and came up with that conclusion.

A. Yes.

Q. Now, she didn't just meet the listings.

A. I thought she equaled the listings.

Q. Equaled the listings. Thank you, Doctor. She just didn't all of a sudden develop a problem on April of '04 to meet the listings, did she?

A. I don't know what—you know, my commission in this is to cite the events in the record, and I—the only things I know about her, and I've already mentioned this discrepancy in 9F, page 22—

ATTY: I appreciate that, Doctor. I want to just stay focused—

ALJ: Let him answer the question, Counsel.

ATTY: All right. Thank you.

ME: The discrepancy is at 9F, 22, March the 25th of 2004; she denied any psychological problems really when speaking with Dr. Susano [sic].² She may have had reasons for doing that. And then in the record, two months later, as I testified, we read about these—the effect of these losses on her. So apparently for whatever reason it is, she didn't mention it to Dr. Susano [sic]. I only have records to go on. I've never examined the patient. I don't now anything more about her, and in the record of 1989, they don't talk much about her losses. They concentrated mostly on her court case.

Q. Yeah, as I understand it, Doctor, what we're looking for is a date of onset of June of 2001. So I'm not sure that the '89 would be---

---

²Dr. John Sassano was the plaintiff's general treating physician and his patient notes are in evidence. While it is correct that a note entered March 25, 2004 "Denies mood swings" appears, in a form he completed under date of December 15, 2003 depression was one of the factors listed among the plaintiff's impairments.

10

> '98 would be that relevant. They also precede her sister's death. Is that right?

A. Yes, that's—

Q. That's right. They also precede the death of her "grandfather."

A. Yes.

Q. Okay, what I guess I'm looking at is I want to focus back. Dr. Mohan thought that her level of severity existed as far back as 2001, 1002.

A. And where did you see that?

Q. Well, I think it's on his questionnaire, sir.

Q. In your opinion, what's the earliest date this level of severity existed, and he has 2001, 2002. That would be at page three.

A. I'm looking at that too.

Q. Yeah, based on the testimony that you have heard today, you would agree with that, wouldn't you? Putting it together with everything else that's there?

A. Well, it says—this is question 28. Is that what we're looking at?

Q. Yes, sir.

A. Okay, explain. She has seen, I think it says, for her depression and anxiety. Her husband passed away in December 2005. This has intensified her depression and anxiety, understandably so. So that what I'm saying to you is we have only his opinion and a checkmark at 2001. I have to leave it to the Judge. If he feels that this is adequate documentation for the onset, then that's the answer.

Q. Thank you. But you can't disagree with it?

A. No, I don't have any opinion on it one way or the other.

On May 17, 2007 the ALJ entered his opinion denying plaintiff's claim. That decision

11

became defendant's final determination upon denial of review by the Appeals Council on April 29, 2009.[3] The AL's "Findings of Fact and Conclusions of Law" were:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2003.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 26, 2001 through her date last insured of September 30, 2003 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: right elbow epicondylitis; and lumbar disc disease (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that through the date last insured, the claimant had the residual functional capacity to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday.

6. Any other factors concerning the clamant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

7. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

8. The claimant was born on December 3, 1954 and she was 48 years old, which is defined as a younger individual age 45-59, on the date last insured (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

---

[3] Why it took the Appeals Council almost two years to render its decision is unknown, but is distressing to this Court (as it must have been to the plaintiff and her counsel).

10. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

12. The claimant was not under a disability as defined in the Social Security Act, at any time from June 26, 2001, the alleged onset date, through September 30, 2003, the date last insured (20 CFR 404.1520(g)).

There are any number of things pertaining to the ALJ's decision that are of sufficient concern to this Court that this Court concludes that the defendant's final determination can not stand.

Leaving the most important of these for last, this Court will start with the fact that there is no mention in the ALJ's decision of a report of a consultative examination performed by Dr. Sheldon Kaffen on June 24, 2004, in which he concluded:

> ASSESSMENT:
>
> The above findings indicate a diagnosis of cervical myofascial pain syndrome; chronic lateral epicondylitis of the right elbow; ulnar neuropathy, right elbow; myofascial pain syndrome, lumbosacral spine; osteoarthritis lumbosacral spine; multiple herniated discs, lumbosacral spine. In addition, the claimant has been diagnosed with major depressive disorder and severe dysthymia. By history she also suffers from chronic obstructive pulmonary disease, hypertension and upper gastrointestinal conditions.
>
> OPINION:
>
> Based on the history and physical examination and review of available medical records, it is my opinion that Ms. Brazile is permanently and totally disabled from all gainful sustained remunerable employment.

13

While there could be a variety of reasons for the ALJ not to place substantial weight on Dr. Kaffen's opinion, that does not justify his failure to offer a cogent explanation for doing so and simply ignoring the report's existence.

The next matter of concern to this Court is the disparity between the residual functional capacity which the ALJ included in the hypothetical question postulated to the vocational expert, which is designed to reflect the claimant's capabilities/limitations, and the residual functional capacity as found by the ALJ. In the ALJ's questioning of Dr. Berger the following appears:

> Q. Now, I'm going to give you the capabilities and limitations of a hypothetical person, and I would like for you to tell me if there are any jobs in significant numbers in the national or regional economy that this person can perform. This person is female, right dominant, 52 years of age, high school education   This person can lift 20 pounds occasionally and 10 pounds frequently with the left hand, only one pound with the right. Sit/stand/walk has to be done at will. Push/pull is only done occasionally. Foot pedal is within normal limits.
>
> A. And what was the last thing?
>
> Q. Foot pedal is done within normal limits.
>
> A. Okay.
>
> Q. This person can occasionally climb a ramp or a stairs. Never use a ladder, rope, or a scaffold. Can frequently balance and stoop and kneel but only occasionally crouch and never crawl. This person could do no overhead lifting with either hand. Occasionally handle and frequently finger and feel. No visual or communications limits. This person should avoid temperature extremes, smoke and fumes. This person cannot accept instructions or criticism and can perform no complex tasks but can do simple, repetitive tasks. This person should have low-stress work, and by that I'm meaning no high-production quotas and no piece work. No work involving supervision of others. No work involving the responsibility for the health or safety of another. No work involving negotiation, confrontation, or arbitration. This person should have only superficial interactions

      with the general public. By that, I mean it's not to the exclusion of interaction but on a very infrequent basis per person such as a cashier or a checker. And that would be it.

A. All right, she has no transferable skills, so we'd be talking about less than a full range of light work. It would be my opinion that such a person would be unable to perform most unskilled jobs at the light or sedentary level because they involve more than occasional handling for one thing and would involve—did you say could not accept criticism?

Q. Um-hum.

A. Yeah, would involve probably some instruction and criticism, certainly some supervision at the unskilled level.

In Finding No. 5 the ALJ found that the plaintiff's residual functional capacity was essentially to perform a full range of light work, i.e., "to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday."

Query—What became of the limitations to: "no overhead lifting with either hand [and] occasionally handle and frequently finger and feel"; "cannot accept instructions or criticism and can perform no complex tasks but can do simple repetitive tasks"; is limited to "low stress work"; and "can only have superficial interactions with the general public" between the hearing and ruling? The ALJ's decision gives no insight into what the answer to this may be. Considering the testimony of the vocational expert quoted above, the vanishing impairments could be of critical importance.

Next, as argued by the plaintiff, the text of the ALJ's decision following Finding No. 5 sheds no light on how he came to his conclusion as to the plaintiff's residual functional capacity. In the text he recites what factors he is supposed to consider in making that determination, and then he completely fails to do so. There is absolutely no reference therein to the impairments he found in

15

Finding No. 4 and/or how they would impact upon the plaintiff's ability to engage in physical activities. Absent such explanation this reviewing Court cannot make a reasoned determination whether the ALJ's generalized conclusion is or is not supported by substantial evidence, within the standard of Richardson v. Perales, 402 U.S. 389 (1971).

Finally, and in this Court's opinion, the most telling errors on the part of the ALJ are found in the following sentences of the text of Finding No. 6:

> Although the claimant's physical and psychological health declined subsequent to her date last insured and Dr. Ross indicated that the claimant would equal a listing as of May 20, 2004, I am precluded from considering that time frame. I also do not find that the severity of the claimant's impairments on May 20, 2004 existed prior to her date last insured. However, Dr. Ross opined that through the date last insured, the claimant did not meet or equal a listing. I concur.

As can be seen from the testimony of Dr. Ross previously set out herein, the statement that he opined that through the plaintiff's last insured date she did not meet or equal a listing is simply wrong. Having opined that the plaintiff equaled Listing 12.04 as of May 2004, he deferred offering an opinion as to whether she did so in 2001, specifically stating "I have to leave it to the Judge. If he feels that this is adequate documentation for the onset, then that's the answer. . . .I don't have any opinion on it one way or the other."

Whether, and if so to what extent, the ALJ's "concurrence" in an opinion that did not exist cannot be known. What can be known is that it is at least possible that this error influenced the ALJ's decision.

Beyond this, this Court is very troubled by the following portions of the text following the ALJ's Finding No. 6:

> While the evidence of record shows that the claimant did not seek psychological treatment until 2004, the date of origin pertaining to

16

>her psychological symptoms was at best, speculation. She was seen by James Helmuth, Ph.D., on May 20, 2004, and he indicated that she had a sad affect daily, very low self esteem, feelings of worthlessness and helplessness, irritability and moodiness, insomnia, weight loss, agitation, social isolation and withdrawal. He noted that this started out as dysthymia five years ago but became worse resulting in major depression starting in about 2002 and he assigned a GAF of 45 (Exhibit 5F1-6). Since Dr. Helmuth did not examine the claimant until May 2004, his opinion that she had major depression is based on dates given to him by the claimant in addition to statements regarding her feelings at that time; thus, it is only speculative when she developed major depression. In addition, he indicted that it started in 2002; however, he does not qualify the level of depression that she may have had at that time. Rather, he indicates that it is worse at the time he saw her in May 2004.
>
>Dr. Helmuth further reported in a disability status report on May 21, 2004, that the claimant's condition became severe on June 2001; however, the date he first examined her was March 4, 2004. It is not plausible that he could determine June 2001 to be the date the claimant had a severe psychological disorder three years prior to examining her (Exhibit 5F3).
>
>The claimant testified that she began seeing a therapist, Nancy Berger, recently and Chander Mohan M.D. in 2004. Although she testified that she saw a psychiatrist prior to Dr. Mohan, there is no documentation submitted indicative of treatment. Both Nancy Berger and Dr. Mohan completed assessments of the claimant's ability to perform work related activities on April 16, 2007. Both Ms. Berger and Dr. Mohan opined that the claimant had marked impairments and the earliest date the same level of severity existed was 2001. However, Dr. Mohan indicated that the claimant's spouse died in December 2006 which intensified her depression and anxiety. (Exhibit 29F1-3, 30F1-6). Once again, it is not plausible that Dr. Mohan or Ms. Berger would have the ability to know the severity of impairment the claimant had in 2001 as they did not examine or even have contact with the claimant at that time. Thus, their documentation does not support the period prior to the claimant's date last insured and therefore, I give their opinions minimal weight.

This Court simply cannot accept the ALJ's statements that the date of origin of the plaintiff's psychological impairments "was at best speculative" and that it was "not plausible" that Dr.

Helmuth, Dr. Mohan and Ms. Berger could offer reliable opinions that the plaintiff's mental/emotional state was at the level of a marked impairment in 2001 because they had no contact with her until 2004. If the date of examination was controlling as to the onset date of an impairment a medical professional could never diagnose a pre-existing condition. This would be particularly so in the case of a mental/emotional impairment, where the mental health professional must rely on his/her patient's account of events that may have triggered or exacerbated a psychological disorder. In this case the mental health professionals, including Dr. Ross, looked to, and obviously accepted as plausible, the history of the deaths of the plaintiff's sister and the patient who represented a grandparent she never knew, each of which predated 2001, as factoring into when her depression became of disabling severity.[4]

In addition, the ALJ's rejection of the opinions of Dr. Helmuth, Dr. Mohan and Ms. Berger because they had no contact with the plaintiff prior to her date last insured is contrary to the dictates SSR83-20, pertaining to onset of disability, which makes clear that in assessing the onset date of disabilities of non-traumatic origin, which would encompass psychological impairments, reports from all medical sources which bear upon the onset date are to be considered. Clearly, the reports of Dr. Helmuth, Dr. Mohan and Ms. Berger bear upon the plaintiff's onset date, and pursuant to SSR 83-20 should have been taken into account.[5]

In this Court's opinion, the ALJ's substitution of his view of plausibility for that of the

---

[4] From Ms. Berger's patient notes it appears that the plaintiff's depression may date back to the death of her father when she was eighteen years old and "never got the opportunity to say goodbye to him [because] the hospital wouldn't allow children in his room," followed by the death of her mother when she was eighteen, leading to her being raised by her grandmother. In the report completed by Ms. Berger under "Additional Comments" she wrote "Unresolved grief after death of parents in childhood complicates current adjustment to the death of her husband.

[5] The Sixth Circuit has held that under the dictates of SSR 83-20 the first date of treatment or diagnosis is not controlling as regards the onset date of disability. Willibanks v. Secretary of Health and Human Services, 847 F.2d 301, 304 (6th Cir. 1988).

mental health professionals was clear error. Giving the evidence originating with the mental health professionals the weight to which it is entitled, the defendant's final determination should be reversed, and judgment entered in the plaintiff's favor finding that she is entitled to an award of benefits pursuant to her application of September 28, 2004.[6] It is recommended that such judgment be entered.

s/DAVID S. PERELMAN<br>
United States Magistrate Judge

DATE:   September 21, 2010

## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[6] Given the limited period from which an award of DIB can be effectuated retrospectively from the date of application the question of whether she was disabled as of her claimed onset date is not critical. In this case, if she was disabled prior to the expiration of her fully insured status she would be entitled to the benefits she seeks.